**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

HEIDI SUE LUCAS,

        Plaintiff,

v.                                                                    CV 14-651 WPL

CAROLYN W. COLVIN, *Acting Commissioner of the Social Security Administration*,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Heidi Lucas filed an application for Disability Insurance Benefits on July 30, 2010. (Administrative Record ("AR") 27.) She alleges disability beginning July 19, 2010, due to bipolar disorder and depression. (AR 158, 176.) Administrative Law Judge ("ALJ") Barry O'Melinn held a disability hearing on July 25, 2012. (AR 45-99.) On January 2, 2013, the ALJ determined that Lucas was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits. (AR 24-44.) Lucas filed an appeal with the Appeals Council, but the Council declined her request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-6.)

Lucas sought review of the SSA's decision (Doc. 1) and filed an opposed Motion to Reverse and Remand for a Rehearing, with Supportive Memorandum (Doc. 16). The Commissioner of the SSA responded (Doc. 20), and Lucas filed a reply (Doc. 21). After having read and considered the entire record and the relevant law, I grant Lucas's motion and remand this case to the SSA for further proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214. However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). The Court may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that []he has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. § 404.1520(a)(4) (2015). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. § 404.1520(a)(4) & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ proceeds to the first of three phases of step four and determines the claimant's residual functional capacity ("RFC"). *See Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996); 20 C.F.R. § 404.1520(e). The ALJ then determines the

2

physical and mental demands of the claimant's past relevant work in phase two of the fourth step and, in the third phase, compares the claimant's RFC with the functional requirements of her past relevant work to see if the claimant is still capable of performing her past work. *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. § 404.1520(f). If a claimant is not prevented from performing her past work, then she is not disabled. *Id.* The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987). If the claimant cannot return to her past work, then the Commissioner bears the burden, at the fifth step, of showing that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Lucas is a fifty-five-year-old woman who completed some college coursework. (AR 158, 177.) Lucas has past work experience as a medical lab technician. (AR 177.)

I focus my discussion of the factual background relating to those issues raised in the motion to remand. While the record includes information about both physical and mental problems, this discussion focuses on Lucas's mental issues. I focus further on those medical opinions which Lucas argues the ALJ considered improperly in his decision.

The earliest medical records in the AR date back to 2004, when Barbara Koltuska, Ph.D., performed a Mini Mental Status Examination on which Lucas scored thirty out of thirty points. (AR 221.) This score revealed grossly intact cognitive functioning and an orientation to time, place, and person. (*Id.*) However, Dr. Koltuska diagnosed Lucas with bipolar II disorder;

personality disorder, not otherwise specified, with borderline traits; frequent headaches/dizziness; moderate functional difficulties due to bipolar disorder and cannabis dependency; and a GAF of fifty to fifty-five.[1] (AR 226-27.)

On December 15, 2008, treating psychiatrist E.B. Hall, M.D., wrote a letter on Lucas's behalf, stating that Lucas was diagnosed with rapid cycling bipolar disorder. (AR 442.) Dr. Hall stated that while Lucas had tried multiple medications, her condition was "clearly not stable," but "slowly improving." (*Id.*) Dr. Hall found that her depression and mood disorder were "every bit as disabling" as her physical problems. (*Id.*) On August 17, 2010, Dr. Hall wrote that Lucas had a long history of mood swings and auditory and visual hallucinations. (AR 443.) Dr. Hall noted that Lucas had been "terminated from her job and is unable to work at this time." (*Id.*)

On September 16, 2010, agency examining psychological consultant John Owen, Ph.D., administered a Mini Mental Status Examination, on which Lucas scored thirty out of thirty points. (AR 447.) Dr. Owen found that Lucas had no gross impairments in her mental status but that she did have occasional hallucinations. (*Id.*) Lucas's recall was adequate, and she could attend to mental status questions. (*Id.*) Dr. Owen diagnosed Lucas with bipolar disorder, type II; posttraumatic stress disorder ("PTSD"); panic disorder without agoraphobia; alcohol abuse and dependence, early full remission. (*Id.*) Further, Dr. Owen determined that Lucas could understand simple questions and instructions, but she would have marked difficulty dealing with

---

[1] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005). A score between forty-one and fifty is assessed when the patient is believed to have "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." *Id.* A score between fifty-one and sixty is assessed when the patient is believed to have "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." *Id.* Although the fifth edition of the *DSM* dropped the GAF rating in 2013 in favor of an alternative assessment schedule, Lucas's mental health providers used this scoring method.

stress. (*Id.*) Lucas's ability to interact with others was unpredictable and her ability to concentrate fluctuated. (*Id.*)

On October 18, 2010, non-examining agency psychologist Dan Cox, Ph.D., completed a Mental RFC Assessment and Psychiatric Review Technique. Dr. Cox diagnosed Lucas with bipolar disorder, PTSD, and alcohol abuse and dependence in early remission. (AR 460, 462, 465.) He found that Lucas was markedly limited in the ability to understand and remember detailed instructions, to carry out detailed instructions, and to interact appropriately with the general public. (AR 453-54.) Dr. Cox stated that Lucas could understand, remember, and carry out simple instructions for repetitive tasks where contact with the general public is incidental. (AR 455.) Dr. Cox determined that Lucas experiences mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (AR 467.) He concluded that Lucas "is severely anxious, easily frustrated and can react with irritability when stressed, as with ambiguity. However, she is demonstrab[ly] functional otherwise." (AR 469.)

Lucas was admitted voluntarily to the University of New Mexico Hospital's ("UNMH") Psychiatric Emergency Services for suicidal ideation on November 19, 2010, and stayed through November 22, 2010. (AR 266-67, 552.) Lucas was diagnosed with major depressive disorder, recurrent, severe without psychotic features; alcohol dependence in early full remission; rule out borderline personality disorder; and chronic mental illness. (AR 552.) Her GAF on admission was twenty-nine,[2] and her GAF upon discharge was fifty-five. (*Id.*)

---

[2] A score between twenty-one and thirty is assessed when the patient is believed to have "[b]ehavior . . . considerably influenced by delusions or hallucinations OR serious impairment in

Lucas was admitted on an involuntary basis for a seven-day hold beginning December 21, 2010, when she called a suicide hotline and reported that she was overdosing on Xanax. (AR 228.) She was diagnosed with recurrent and severe depression without psychotic symptoms. (AR 238.) Her GAF was twenty-five on admission and fifty upon discharge. (AR 229, 238.)

On December 22, 2010, Dr. Hall completed an Assessment of Adaptation to Temperament Characteristics Required by Jobs. (AR 215.) Dr. Hall found that Lucas should avoid all temperament characteristics, including performing repetitive or short-cycle work; performing a variety of duties; working alone or apart in physical isolation from others; performing effectively under stress; dealing with people; working under specific instructions; making judgments and decisions; attaining precise set limits, tolerances, and standards; influencing people in their opinions, attitudes and judgments; and directing, controlling or planning activities of others. (*Id.*) Dr. Hall also found that Lucas has marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration. (AR 216-17.) Dr. Hall marked on an evaluation about Lucas's anxiety that her disorder "result[s] in complete inability to function independently outside the area of one's home." (AR 217.)

On February 2, 2011, non-examining agency psychologist Donald Gucker, Ph.D., completed a Mental RFC Assessment and Psychiatric Review Technique for Lucas. Dr. Gucker found Lucas to be moderately limited in the majority of measured areas and markedly limited in her ability to interact appropriately with the general public. (AR 583.) Dr. Gucker determined

---

communication or judgment . . . OR inability to function in almost all areas." *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34.

that Lucas has moderate restrictions in activities of daily living, moderate difficulties in maintaining social function, and moderate difficulties in maintaining concentration, persistence, or pace. (AR 596.) Dr. Gucker concluded that there was insufficient evidence regarding episodes of decompensation. (*Id.*) He concluded that Lucas could—when compliant with her medications and substance free—"understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a work setting." (AR 585.)

On May 13, 2011, Lucas reported at a follow-up appointment at UNMH that she was doing better, that she had taken community college classes that semester, and that she got all As and Bs on her final examinations. (AR 655.)

Neil Rigsbee, MA, LPCC, wrote two conflicting letters on Lucas's behalf on July 29, 2011. (AR 728, 731.) Lucas had been seeing Rigsbee for therapy once per week since December 2010 and began seeing him twice per week in July 2011. (AR 691.) One letter stated that Lucas was diagnosed with bipolar II disorder, anxiety disorder with panic attacks, and possible PTSD, and that Lucas could work more than twenty hours per week. (AR 728.) The other letter, apparently directed at the SSA, stated that "[d]ue to her conditions and recent exacerbation of symptoms, [Lucas] is no longer able to work more than twenty hours per week. Please consider Ms. Lucas for social security disability." (AR 731.)

On August 5, 2011, Lucas reported to Rigsbee that she earned an A on a paper and project for school, and she stated that she would be working on a take-home exam all weekend. (AR 732.) On August 19, 2011, Lucas informed Rigsbee that she received two A's and 1 B for the previous term, and she was disappointed and angry about the B. (AR 725.)

On January 24, 2012, Rigsbee wrote another letter on Lucas's behalf, stating that Lucas could not work more than twenty hours per week. (AR 691.) On February 14, 2012, Lucas reported to Rigsbee that a teacher called her "defensive." (AR 694.) Rigsbee completed a Medical Assessment of Ability to do Work-Related Activities (Mental) and an Assessment of Adaptation to Temperament Characteristics Required by Jobs on February 24, 2012. Rigsbee found marked limitations in Lucas's ability to maintain attention and concentration for extended periods of time, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, and set realistic goals or make plans independently of others. (AR 685-86.) Rigsbee also noted that Lucas becomes disoriented to the time and day of the week one to two times per month. (AR 686.) With respect to temperament, Rigsbee concluded that Lucas should avoid all temperament characteristics required by jobs except for working alone or apart in physical isolation from others and working under specific instructions. (AR 687.) Finally, Rigsbee determined that Lucas had marked restriction in activities of daily living; marked difficulties in maintaining concentration, persistence or pace; and marked difficulties in maintaining social functioning. (AR 689.) On February 28, 2011, Rigsbee wrote a letter on Lucas's behalf that stated that Lucas is "no longer able to perform productive consistent work." (AR 748.)

On March 20, 2012, Lucas informed treating psychiatrist Kathryn Fraser, M.D., whom she began seeing in February 2012 instead of Dr. Hall, that she was taking a full load of community college class and had received 97% on a midterm. (AR 681, 801.) Dr. Fraser wrote, "This indicates to me that [Lucas] is able to follow up with classes as far as studying and concentrating, although this doesn't necessarily translate to being able to work." (AR 681.)

On October 3, 2012, psychiatrist Samuel Nickell, M.D., began treating Lucas, and he wrote that he was treating Lucas for refractory bipolar affective disorder and that her condition was not well controlled. (AR 8, 840.) He stated, "Certainly from a psychiatric standpoint, I find her unable to work in any capacity." (*Id.*)

### HEARING TESTIMONY

Lucas testified that she last worked on July 16, 2010, when she was fired for making a lot of mistakes entering medical test results into a computer and for having a nine-inch hunting knife in her car on work premises. (AR 52-54.) Lucas was having difficulty concentrating on her work, and she worked slowly. (AR 52, 54.) Lucas stated that she had never gone to work intoxicated, though she had a drinking problem in the past. (AR 53.) While Lucas applied for jobs after her termination, she never received any interviews. (AR 56.)

Lucas testified regarding an inpatient hospitalization in December 2010 for a suicide attempt involving an overdose of Xanax. (AR 67-69.) Lucas called a suicide hotline, and an ambulance came to pick her up. (AR 69.) She attested that she had experienced suicidal thoughts since the age of five. (*Id.*) Lucas went to a hospital in July 2011 for voluntary inpatient treatment because of anxiety, caused largely by difficulties with school. (AR 70.) Lucas also testified about cutting her arm for a time as a means to relieve anxiety. (AR 70-71.)

Lucas asserted that she saw Dr. Hall for approximately two years, but that the medications he prescribed were not helpful, and she switched to Dr. Fraser when she became a UNMH patient and could no longer afford Dr. Hall's fees. (AR 72-73.)

Lucas indicated that she was taking one summer computer class, on Tuesdays and Thursdays. (AR 73-74.) She explained that she was having trouble keeping up with four classes, though she had been getting A's and B's. (AR 74-75.) Specifically, Lucas stated that she had

trouble keeping track of which classes were held on which days and in which classrooms, which assignments were for which classes, when assignments were due, and the dates of tests. (AR 75, 84.) She also received special permission to record her classes because her medication made note-taking difficult. (AR 75-76.) With respect to her summer class, Lucas testified that she was seeing a tutor each week because she had previously tried to take the class and had to drop it because she could not keep up. (AR 83.) Lucas also warranted that she did not have any friends at school or many friends in general because she is hard to get along with. (AR 84.)

Lucas attested that she has difficulty sleeping because of stress and anxiety. (AR 84-85.) She asserted that she would not be able to perform a medical technician job again because she has problems with concentration and focus and would make mistakes. (AR 88.) Further, she has difficulties working with supervisors and coworkers. (*Id.*)

## THE ALJ AND APPEALS COUNCIL'S DECISIONS

I focus this section on those parts of the ALJ's decision that are relevant to the motion to remand. The ALJ determined at step one of the sequential evaluation process that Lucas had not engaged in substantial gainful activity since her alleged disability onset date of July 19, 2010. (AR 29.) At step two, the ALJ determined that Lucas suffers from the following severe impairments: bipolar disorder, borderline personality disorder, obesity, cervical spine stenosis, status post left ulnar decompression, and status post left humerus fracture. (*Id.*) At step three, the ALJ found that Lucas's combination of severe impairments did not equal one of the listed impairments. (AR 30.) The ALJ found that Lucas has a mild restriction in activities of daily living. (*Id.*) The ALJ also found that Lucas has moderate difficulties in social functioning. (*Id.*) The ALJ pointed out that, despite Lucas's claims about her social functioning, her success at school indicates that she can function socially. (*Id.*) The ALJ also concluded that Lucas has mild

difficulties with regard to concentration, persistence, or pace. (AR 31.) The ALJ stated, "I see no way [Lucas] could achieve such high grades if her ability to concentrate were even remotely as poor as claimed." (*Id.*) Finally, the ALJ found that Lucas had experienced no episodes of decompensation of an extended duration. (*Id.*)

The ALJ then determined Lucas's RFC, finding that she can perform light work with certain physical restrictions and the following mental limitations: she can understand and carry out detailed, but not complex, instructions and make corresponding work-related decisions; and she can respond appropriately to supervision, co-workers, and other work situations; deal with routine changes in the work setting; maintain concentration, persistence and pace for up-to-and-including two hours at a time with normal breaks; and have only occasional interaction with the public and with co-workers. (*Id.*)

The ALJ summarized Lucas's functional allegations and her return to school following her job termination. (AR 32-33.) The ALJ determined that Lucas's "high level of success in maintaining a full-time college curriculum in criminal justice is inconsistent with her claims that she cannot concentrate or maintain persistence and pace." (AR 33.) Further, the ALJ questioned Lucas's claims of disability because Lucas testified that she continued to look for work after her termination. (*Id.*) These factors led the ALJ to question Lucas's credibility and therefore undermined the opinions of Lucas's medical providers to the extent that they relied on Lucas's subjective reports. (*Id.*)

The ALJ cited the 2004 neuropsychological evaluation by Dr. Koltuska and found significant that Lucas suffered long-term mental impairments, yet she continued to maintain employment for several years. (AR 33-34.) The ALJ then summarized the opinions of Dr. Owen,

Dr. Hall, Rigsbee, Dr. Fraser, and Dr. Nickell, and outlined Lucas's inpatient visits for suicidal ideation. (AR 34-36.)

The ALJ stated that non-examining agency physicians concluded that Lucas's impairments were not severe enough to be disabling and that he had considered their opinions in accordance with Social Security Ruling ("SSR") 96-6p, 1996 WL 374180 (July 2, 1996).[3] (AR 37.) He also stated that he considered the opinions expressed by treating and consulting physicians and an opinion by a state agency physician who found that Lucas would have the capacity for work in the presence of continued treatment, medical compliance, and no substance abuse.[4] (AR 38.) Further, the ALJ considered statements by third parties about Lucas's abilities. (*Id.*) The ALJ then accorded "some weight" to "them,"[5] but noted that when read with the entire record, he did not believe that "they" established limits greater than that determined in the RFC. (*Id.*)

The ALJ then recognized that Lucas's treating sources generally concluded that Lucas could not work, but he gave these opinions "partial" weight because he accorded "much greater weight to [Lucas's] demonstrated ability to succeed in full time college courses than to the various [treating] opinions." (*Id.*) The ALJ concluded that "[t]he providers do not give adequate weight to her real world successes, which require a much higher capability than they credit." (*Id.*)

---

[3] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

[4] This reference appears to deal with the opinion of Dr. Gucker. (AR 585.)

[5] It is unclear whether the ALJ accorded "some weight" only to the third party statements (*see* AR 202-12, 403-05) or to these statements and the opinions of the treating and agency physicians.

12

The ALJ then concluded that Lucas is capable of performing past relevant work as a medical laboratory technician. (*Id.*)

Lucas appealed the decision to the Appeals Council, but the Council found that Lucas's reasons for disagreeing with the hearing outcome did not provide a basis for changing the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 1-2.) The Appeals Council accepted AR 847-927 as additional evidence for the record (*see* AR 6), but rejected records from Rigsbee dated March 2014 and from Dr. Nickel dated March 2013 because the ALJ decided the case through January 2, 2013, and these records were about a later time. I do not discuss these later records in this Order because Lucas does not dispute the Appeals Council's rejection of these records.

## DISCUSSION

Lucas makes several arguments for remanding or reversing the ALJ's decision. Lucas argues that 1) the ALJ erred in assessing her RFC because he declined to adopt the opinions of her treating psychiatrists and therapist without a legally sufficient explanation; 2) the ALJ erred by failing to incorporate the consultative examination report and non-examining medical opinions into her RFC; 3) the RFC is unsupported by substantial evidence; and 4) the ALJ presented an insufficient hypothetical to the vocational expert.

### I. Evaluation of Opinions of Treating Psychiatrists and Therapist

Pursuant to 20 C.F.R. § 404.1527(c), "[r]egardless of its source, [the ALJ] will evaluate every medical opinion [he] receive[s]. Unless [the ALJ] give[s] a treating source's opinion controlling weight under paragraph (c)(2) of this section, [the ALJ] consider[s] all of the

following factors in deciding the weight [to] give to any medical opinion."[6] According to SSR 96-2p, if a treating physician's opinion is not entitled to controlling weight, the "opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527." 1996 WL 374188, at *4 (July 2, 1996). These factors thus apply to the consideration of medical opinions from "acceptable medical sources" who are not treating sources given controlling weight and "all opinions from medical sources who are not 'acceptable medical sources' as well as from 'other sources,' . . . who have seen the individual in their professional capacity." SSR 06-03p, 2006 WL 2329939, at *4 (Aug. 9, 2006). "Acceptable medical sources" include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. *Id.* at *1. Medical sources that are not acceptable medical sources include, but are not limited to, nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. *Id.* at *2.

Lucas argues that the ALJ "failed to make a distinct, two-step analysis" when considering the opinions of Dr. Hall, Rigsbee, and Dr. Nickell. (Doc. 16 at 12.) Specifically, Lucas contends that the ALJ failed to show that he considered all—or even any one—of the six factors in 20 C.F.R. § 404.1527(c) and failed to clearly explain the resulting weight accorded to these opinions. Recognizing that the ALJ relied on Lucas's enrollment in community college classes in

---

[6] These factors include:
(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Krauser v. Astrue*, 638 F.3d 1324, 1331 (10th Cir. 2011) (quotation and citation omitted); *see also* 20 C.F.R. § 404.1527(c)(2).

making his decision, Lucas asserts that the ALJ provided no evidence that her medical providers did not consider this enrollment and her grades in forming opinions that Lucas cannot work.

The Commissioner argues that the ALJ sufficiently evaluated the medical opinions at issue by discussing the content of each opinion; stating that he was relying heavily on Lucas's successful full-time academic enrollment and her continued pursuit of work and receipt of unemployment benefits; and expressly according the opinions "partial weight." (Doc. 20 at 10.) The Commissioner also argues that it is not reversible error for an ALJ to fail to state expressly that he is not according controlling weight to a treating source, where it is apparent from the decision that the ALJ declined to accord controlling weight. Finally, the Commissioner contends that I should reject Lucas's argument that the ALJ was required to discuss all six factors in 20 C.F.R. § 404.1527(c).

The Commissioner is correct that it is not reversible error for the ALJ to fail to state explicitly that he is not according controlling weight to a treating source where "[the Court] can tell from the decision that the ALJ declined to give controlling weight." *Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014). Such is the case here, as the ALJ wrote that he accorded "partial weight" to Lucas's treating and examining sources. (AR 38.) The Commissioner is also correct that "not every factor for weighing opinion evidence will apply in every case." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (quotation omitted). Therefore, the ALJ was not required to discuss all six factors in 20 C.F.R. § 404.1527(c). However, the ALJ did not attempt to address any of the factors in 20 C.F.R. § 404.1527(c). Instead, the only reasoning the ALJ provided for according "partial weight" to the opinions of Dr. Hall, Rigsbee, and Dr. Nickell, was the extent of Lucas's success in community college courses. Accordingly, I find that the ALJ committed legal error in failing to consider and discuss factors in 20 C.F.R. § 404.1527(c)

when determining the weight to accord these opinions. On remand, the ALJ must properly evaluate the opinions of Dr. Hall, Rigsbee, and Dr. Nickell and consider these opinions when addressing the RFC stage of the sequential evaluation process.

## II. Evaluation of Opinions of State Agency Physicians

Lucas also argues that the ALJ failed to "accept and incorporate, or explain or discuss in any way how [certain] medical opinions would be weighed," in violation of SSR 96-6p, 1996 WL 374180. Lucas refers specifically to the opinions of examining consultant Dr. Owen and non-examining agency physicians Drs. Cox and Gucker.

The Commissioner argues that the ALJ reasonably relied on the opinion of Dr. Gucker, rather than those of Dr. Cox or Dr. Owen, as Dr. Gucker had a more expansive medical record to rely on in forming his opinion. The Commissioner also argues that the ALJ expressly gave weight to Dr. Gucker's opinion in his decision.[7]

SSR 96-6p states that "[ALJs] and the Appeals Council may not ignore the[] opinions [of state agency physicians] and must explain the weight given to these opinions in their decisions." SSR 96-6p, 1996 WL 374180, at *1. "Unless a treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist." 20 C.F.R. § 404.1527(e)(2)(ii); *see, e.g.*, *Vergara v. Colvin*, 535 F. App'x 687, 691 (10th Cir. 2013) (unpublished); *cf. Norris v. Barnhart*, 197 F. App'x 771, 773-74 (10th Cir. 2006) (unpublished) (finding that because all of the medical evidence was consistent, the ALJ was not required to state the weight attributed to each opinion pursuant to SSR 96-6p). The

---

[7] Without naming Dr. Gucker explicitly, the ALJ mentions a "State agency medical physician[]" in the decision. (*See* AR 38.)

16

factors in 20 C.F.R. § 404.1527(c) apply in determining the weight to be accorded. *See* 20 C.F.R. § 404.1527(e)(2)(ii).

In this case, it is clear that the ALJ did not accord controlling weight to any treating source's opinion. It is unclear just how much weight the ALJ accorded to Dr. Gucker or even if "some weight" applied to Dr. Gucker's opinion at all, due to the disorganized writing in the decision. Assuming the ALJ accorded "some weight" to Dr. Gucker's decision, the ALJ failed to assess the decision in accordance with 20 C.F.R. § 404.1527(c). Therefore, the ALJ erred in his discussion of Dr. Gucker's opinion for failing to clearly specify the weight given to his opinion, accompanied by a discussion of the factors in 20 C.F.R. § 404.1527(c), in accordance with SSR 96-6p.

The Commissioner has cited to no authority for the proposition that the ALJ reasonably ignored the opinions of Drs. Cox and Owen in favor of assessing the later opinion of Dr. Gucker. As such, upon remand, the ALJ is instructed to consider and discuss the opinions of Drs. Cox and Owen.

Because the ALJ failed to discuss any of the factors in 20 C.F.R. § 404.1527(c) with respect to the medical providers analyzed in this Order, I do not reach any arguments Lucas made about specific omissions from the RFC. Upon weighing the evidence in accordance with the factors in 20 C.F.R. § 404.1527(c), the ALJ may adjust the RFC. Nor do I reach Lucas's arguments that the RFC is not based on substantial evidence or that the hypotheticals posed to the vocational expert were defective.

## CONCLUSION

I conclude that the ALJ erred by failing to weigh the opinions of Dr. Hall, Rigsbee, Dr. Owen, Dr. Cox, Dr. Gucker, and Dr. Nickell in accordance with the factors set out in 20 C.F.R.

§ 404.1527(c). This case is remanded to the SSA for further proceedings consistent with this opinion.

    IT IS SO ORDERED.

*[Signature]*
William P. Lynch
United States Magistrate Judge

18

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.